IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **BLACK ROCK COFFEE BAR, LLC**,<br><br>    Petitioner,<br><br>v.<br><br>**BR COFFEE, LLC,** *et al.*,<br><br>    Respondents. | Case No. 3:20-cv-976-SI<br><br>**OPINION AND ORDER** |

J. Matthew Donahue, Shannon Armstrong, Kristin Asai, and Lisa Howley, HOLLAND & KNIGHT LLP, 601 SW Second Avenue, Suite 1800, Portland, OR 97204. Of Attorneys for Petitioner.

Kenneth R. Davis II and Mohammed N. Workicho, LANE POWELL PC, 601 SW Second Avenue, Suite 2100, Portland, OR 97204; Jonathan W. Fountain and Jennifer R. Lloyd, HOWARD & HOWARD ATTORNEYS PLLC, 3800 Howard Hughes Parkway, Suite 1000, Las Vegas, NV 89169. Of Attorneys for Respondents.

**Michael H. Simon, District Judge.**

      Petitioner Black Rock Coffee Bar, LLC ("Black Rock") has petitioned the Court under § 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, to compel arbitration of Black Rock's dispute with Respondents BR Coffee, LLC; BR Rainbow OP, LLC; BR Blue Diamond OP, LLC; BR Silverado Ranch OP, LLC; BR Ft. Apache OP, LLC; and BR Rainbow North OP, LLC (collectively, the "BR Parties"). Opposing the petition, the BR Parties argue that there is no valid contract—and thus no valid arbitration clause—because Black Rock committed fraud in the

execution of the contract. The BR Parties also contend that, under the first-to-file rule, the Court should abstain from exercising jurisdiction because the BR Parties have an earlier-filed lawsuit against Black Rock pending in California state court. For the following reasons, the Court finds that the first-to-file rule does not apply here and abstention is unwarranted under the *Colorado River* doctrine. On the merits, the Court holds that even accepting as true all allegations by the BR Parties, they only show that the contract may be voidable but not void. Thus, the Court grants Black Rock's petition.

## STANDARDS

In all contracts involving interstate commerce, the FAA specifies that "written agreements to arbitrate controversies arising out of an existing contract 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (quoting 9 U.S.C. § 2). The FAA "leaves no place for the exercise of discretion by a district court," but "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Id.* at 218 (citing 9 U.S.C. §§ 3-4) (emphasis in original). The district court must limit itself "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

Under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983). But the "liberal federal policy regarding the scope of arbitrable issues is inapposite" to the question of whether a party assented to the arbitration agreement. *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006). The validity of an arbitration agreement remains "a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not

agreed so to submit." *AT & T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). Because arbitration is "a matter of contract," the FAA "places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (citations omitted). Courts also should generally "apply ordinary state-law principles that govern the formation of contracts" to determine whether the parties agreed to arbitrate. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

Unless there is clear and unmistakable evidence that the parties agreed that an arbitrator should decide issues of arbitrability, *see Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019), a court must decide "the threshold issue of the existence of an agreement to arbitrate." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991). In deciding whether an agreement to arbitrate exists, a court should apply a summary judgment-style standard. "Only when there is no genuine issue of fact concerning the formation of the agreement" should the court decide as a matter of law that an agreement to arbitrate exists. *Id.* at 1141 (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)). A court must give the party opposing a motion to compel arbitration "the benefit of all reasonable doubts and inferences that may arise." *Id.* The party seeking to compel arbitration bears "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). When "the making of the arbitration agreement" is at issue, "the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. "The court shall hear and determine such issue" if the party alleged to be in violation of the agreement does not demand a jury trial. *Id.*

## BACKGROUND

Black Rock is an Oregon company that developed a retail chain of coffee shops with locations in Oregon, Washington, Idaho, California, Arizona, and Texas. The BR Parties are a group of business entities affiliated with Chris Lattanzio and Michael Georgen that sought to open and operate the first Black Rock franchises in Las Vegas, Nevada. Respondents ultimately opened three such franchises and had plans to open more before the parties' business relationship deteriorated.

There are several documents or types of documents relevant to this dispute. The first is the Geographic Territory Agreement ("GTA"), which Black Rock and BR Coffee signed in August 2019. The second type of document is a Franchise Agreement ("FA"). There are three FAs relevant to this dispute, one for each of the Black Rock-branded coffee bars that the BR Parties ultimately opened: (1) the Blue Diamond FA, signed August 23, 2019; (2) the Rainbow FA, signed the same day; and (3) the Silverado Ranch FA, signed in October 2019. The third relevant document is the Franchise Disclosure Document ("FDD"). The GTA is an overarching contract that gave BR Coffee the exclusive right to create up to 10 coffee bars in Clark County, Nevada. The FAs state the specific terms governing the operations of each of the respective franchises that BR Coffee created. The FDD is a document that franchisors must disclose under Oregon, California, and federal law.

The parties' business relationship deteriorated over a dispute about how much the BR Parties owed Black Rock in Initial Franchise Fees and Grand Opening Fees. The parties exchanged several emails stating their respective understanding of the amount of fees required under the contract, but they could not agree. Under a provision of the relevant contracts, the BR Parties eventually demanded a mediation to resolve the issues. Before that mediation occurred, however, Black Rock purported to exercise its contractual right to purchase the franchisees'

Nevada locations. The price that Black Rock stated it would pay under the contract, 12 times EBITDA (earnings before interest, taxes, depreciation, and amortization), surprised the BR Parties, who expected that if Black Rock chose to exercise its purchase rights, the BR Parties would get back *at least* the amount of their investment in the franchises.

The confusion appears to have arisen based on a discrepancy in the terms of Black Rock's purchase option in the form GTA and FA that was included in the 2018 FDD and the terms for the purchase option contained in the signed GTA and FAs. The 2018 FDD stated, in relevant part:

> Subject to applicable law, BRCB has the option to purchase the franchise business at any time following the Grand Opening. If purchase occurs 1 year or less after the Grand Opening, then the Purchase Price will equal the greater of (A) 5 times the business's annualized EBITDA (Earnings before interest, tax, depreciation and amortization) based on EBITDA for the month immediately preceding BRCB's exercise of the purchase right or (B) Franchisee's (actual, documented, reasonable and customary) costs (including fees paid to BRCB). Thereafter, the purchase price shall equal 5 times the business's EBITDA for the twelve-month period ending as of the last full calendar month immediately preceding BRCB's exercise of the purchase right.

The FAs, however, included a revised franchise purchase option provision in Section 15.7 that eliminated price option (B), which ensured that the BR Parties could recover their costs if Black Rock exercised its purchase option, and changed price option (A) to be 12 times EBITDA, instead of five times. The BR Parties contend that, before they signed the final GTA and FAs, counsel for the BR Parties asked counsel for Black Rock whether Black Rock had changed any of the terms from the form contracts previously disclosed in the 2018 FDD. According to the BR Parties, counsel for Black Rock told counsel for the BR Parties that no terms had been changed, even though Black Rock had modified Section 15.7 of the FAs. The BR Parties further assert that

PAGE 5 – OPINION AND ORDER

they signed the contracts without having noticed this discrepancy. For purposes of the pending motion, the Court views the evidence in the light most favorable to the BR Parties.

In sum, the BR Parties allege that Black Rock fraudulently changed the purchase option terms in Section 15.7 without the knowledge or consent of the BR Parties so that Black Rock could later purchase the BR Parties' franchises without fully compensating them for their investment. The BR Parties notified Black Rock that they were rescinding the GTA and each of the franchise agreements based on Black Rock's alleged fraud. The BR Parties then sued Black Rock in California state court, and that action is pending. Black Rock then filed in this Court a petition to compel the BR Parties to participate in arbitration. Both the GTA and the FAs include arbitration clauses whose validity is not challenged apart from the dispute over the validity of the entire contract.

## DISCUSSION

### A.   First-to-File Rule and *Colorado River* Abstention

Before the Court addresses the merits of Black Rock's petition to compel arbitration, the Court must first decide whether the dispute over whether arbitration is required properly belongs in this court or in the earlier-filed California state lawsuit. There is some confusion in the caselaw about the relationship between the first-to-file rule and *Colorado River* abstention. The first-to-file rule is a "general principle to avoid duplicative litigation" "between federal courts." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Some courts have explained that the first-to-file rule applies only to concurrently pending lawsuits filed in different federal district courts. *See, e.g.*, *Numrich v. JPMorgan Chase Bank, N.A.*, 2012 WL 1952654 at *5 (D. Or. May 30, 2012). Other courts, however, have said that the first-to-file rule applies even in the state-federal context, that is, when one lawsuit is in federal court and another

is in state court. *See, e.g.*, *Shannon v. Bayview Loan Servicing* LLC, 2018 WL 1902680 at *2 (D. Or. Apr. 20, 2018); *Gens v. SEZ Am., Inc.*, 2007 WL 832050 at *4 (N.D. Cal. Mar. 19, 2007).

The Supreme Court has been clear that the *Colorado River* abstention doctrine, rather than the first-to-file rule, governs a federal court's decision whether to defer to a state court and abstain from exercising jurisdiction and that abstention under *Colorado River* should be much rarer than abstention under the first-to-file rule. *See Colorado River*, 424 U.S. at 817 ("This difference in general approach between state-federal concurrent jurisdiction and wholly federal concurrent jurisdiction stems from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them."); *see also Kohn Law Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*, 787 F.3d 1237, 1239 (9th Cir. 2015) ("The first-to-file rule allows a district court to stay proceedings if a similar case with substantially similar issues and parties was previously filed *in another district court*.") (emphasis added); *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622 (9th Cir. 1991) ("The first-to-file rule may be applied 'when a complaint involving the same parties and issues has already been filed *in another district*.'") (emphasis added) (citation omitted).

Further, the *Colorado River* abstention doctrine applies only in exceptional circumstances.[1] *See Colorado River*, 424 U.S. at 817; *Moses H. Cone Mem'l Hosp. v. Mercury Construction Co.*, 460 U.S. 1 (1983). *Colorado River* instructs courts to consider: (1) the problems that occur when a state and federal court assume jurisdiction over the same *res*; (2) the relative inconvenience of the federal forum; (3) the need to avoid piecemeal litigation; and (4) the order in which the state and federal proceedings were filed. *Id.* at 818-19. *Moses H. Cone*

---

[1] The Supreme Court gives more discretion to district courts to abstain when the federal action is brought under the Declaratory Judgment Act. *See Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). That is not the case here.

PAGE 7 – OPINION AND ORDER

adds that courts must carefully balance several additional factors in deciding whether abstention is appropriate, including whether a federal question is present, which forum's substantive law would govern the merits of the litigation, and the adequacy of the state forum to protect the rights of the parties. 460 U.S. at 23. In that case, the Supreme Court explained that the existence of a federal question weighs heavily against abstention. *Id*.

*Moses H. Cone* dealt with circumstances very similar to those here. There, the plaintiff in the state action filed a suit seeking a determination that its contract with the defendant, Mercury Construction, was not subject to arbitration. Mercury Construction later initiated a federal district court proceeding, seeking to compel arbitration under § 4 of the FAA. The district court stayed its proceeding in favor of the pending state court litigation, but the Supreme Court held that the district court's abstention was inappropriate under *Colorado River*. The Supreme Court explained that the mere duplicativeness of parallel state and federal proceedings cannot justify abstention and stressed that federal courts generally must decide cases within their jurisdiction. *Id*. at 25-26.

The BR Parties have not distinguished this case from *Moses H. Cone*. Black Rock seeks precisely the same relief as the petitioners sought in that case, and the factual circumstances here are virtually identical. Thus, it would be inappropriate for the Court to abstain under the *Colorado River* doctrine from exercising its jurisdiction in this lawsuit.

**B.      Validity of Arbitration Clause**

The BR Parties contend that the arbitration clauses in the GTA and the FAs are invalid because Black Rock committed "fraud in the execution," thus making the entire contract void *ab initio*. Black Rock replies that the BR Parties cannot show fraud in the execution and in fact have only alleged "fraud in the inducement," a claim that an arbitrator must decide. The BR Parties contend that California contract law governs this dispute, while Black Rock maintains that

PAGE 8 – OPINION AND ORDER

Oregon law controls. Neither side, however, has identified for the Court any material differences between California law and Oregon law on the subject of "fraud in the execution."

If a party seeking to avoid arbitration alleges fraud in the inducement of an entire contract, that contention must be resolved by an arbitrator. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967). In contrast, if a party alleges that the arbitration clause itself was fraudulently induced, a federal court may resolve that issue. *Id*. The BR Parties do not assert fraudulent inducement of the arbitration clause. Instead, they seek to avoid application of *Prima Paint* by arguing that Black Rock committed "fraud in the execution" of the contract, rendering the entire contract void, not merely voidable. With a void contract, there is no valid agreement to arbitrate.

On the other hand, if Black Rock only fraudulently *induced* the BR Parties into signing the contract, the contract is merely voidable, and the arbitration clause in such a contract must be enforced; an arbitrator will then decide whether the balance of the agreement is enforceable. *See Lupton v. Bangs*, 117 Or. 11, 16 (1926) ("Fraud may induce a person to assent to something which he would not otherwise have done, or it may induce him to believe that the act which he does is something other than it actually is. In the first case, the act of the defrauded person is effectual, though voidable; in the second case the act of the defrauded person is void.") (simplified) (applying Oregon law); *Sw. Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir. 1986) ("[Fraud in the inducement] induces a party to assent to something he otherwise would not have; [fraud in the execution] induces a party to believe the nature of his act is something entirely different than it actually is.") (applying California law); *Rosenthal v. Great Western Fin. Sec. Corp.*, 14 Cal.4th 394, 409-410 (1996) ("Claims that a party has employed fraud in inducing consent specifically to the arbitration agreement (e.g., by actively concealing

its existence or misrepresenting its meaning or value) are, under *Prima Paint*, to be decided by the court, because they go to the valid making of the arbitration clause itself. Claims that, due to fraud in the execution of the agreement as a whole, the parties failed to form a contract containing an arbitration clause, are also to be decided by the court").

"Fraud in the execution arises when a party executes an agreement 'with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms.'" *Rozay's Transfer*, 791 F.2d at 774 (quoting Uniform Commercial Code § 3–305(2)(c)). Central to resolving Black Rock's petition is the meaning of the phrase "reasonable opportunity to obtain knowledge." Black Rock contends that the BR Parties had a reasonable opportunity to obtain knowledge of any discrepancy, and thus there is no fraud in the execution, even if there may be fraudulent inducement. The BR Parties deny that they had such a reasonable opportunity because their counsel reasonably relied on a false representation made by Black Rock's counsel.

    **1.**    **Reasonable Opportunity**

The BR Parties assert that Black Rock deceptively altered the purchase option terms from the 2018 FDD, secretly slipping new terms into the FAs that were more favorable to Black Rock, which the parties then signed. The BR Parties contend that they asked Black Rock's counsel if any terms had been changed from the 2018 FDD and that Black Rock's counsel affirmatively—but falsely—responded that the terms in the FA were exactly as they were in the 2018 FDD. The BR Parties also note that state and federal franchise law obligated Black Rock to disclose any changes to an FDD and allege that the parties agreed early in the negotiations that the form of the franchise agreements in the 2018 FDD was settled and not open to negotiation.

The evidence presented by the BR Parties, viewed in the light most favorable to them, does not show that the BR Parties were deprived of a "reasonable opportunity to obtain knowledge" of the contract's character or essential terms. Indeed, they (or their attorney) could

have simply verified whether the terms of the FAs they signed matched the terms of the form FAs in the 2018 FDD.

The BR Parties invite the Court to consider the Second Circuit's decision in *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28 (2d Cir. 1997). In that case, two parties, without the benefit of counsel, were in the process of signing an agreement that had undergone some last-minute changes. One party left the room, returned with a modified final first page, and the second party approved that final change. When the second party turned his back to the document, the first party opened the document to the last page, which everyone then signed. The first party immediately left the room with the signed document and returned with an envelope into which the first party placed the document and handed it to the second party. The second party did not again look at the signed document again until a dispute arose several months later. At that time, the second party learned that the first party had switched the first page, which was the agreed-upon page, for an earlier version, to which the second party had expressly objected. *Id*. at 30.

The Second Circuit stated that "[p]roof that a party secretly substituted one type of document for another is evidence of fraud in the execution." *Id*. at 32. But the court also cautioned that its ruling did not "relax the basic responsibility of contracting parties to review a document before signing it. On this record, a jury could find that [the second party] did diligently review what he was about to sign, but that his diligence was thwarted by a quick and undetected switch of documents immediately after his review and prior to his putting pen to paper." *Id*. at 34. The facts in *Hetchkop* are distinguishable from those in the pending case. Here, the BR Parties and their counsel had several days to review the final contract before they signed it. Their diligence was not "thwarted" by the kind of bait and switch seen in *Hetchkop*, which occurred over a period lasting about six seconds. *Id*. at 30.

PAGE 11 – OPINION AND ORDER

The BR Parties' own citation to *Rosenthal v. Great Western Fin. Sec. Corp.* shows that the facts alleged here do not amount to fraud in the execution. 14 Cal. 4th 394 (1996). In *Rosenthal*, several investors sought to avoid enforcement of an arbitration clause in their contract. Some of the investors told the court that they had not read the contracts because the bank's representatives told them the written contracts were unimportant or that the investors need not read them. Others claimed they did not read the contract before signing because they trusted the bank's representatives and perceived fiduciary relationship with them. Still others claimed they did not read the agreement because they could not read English or because they were blind and because the bank representatives told them they were signing "a signature card" instead of a client agreement.

In *Rosenthal*, the court found fraud in the execution *only* in the case of the investors who could not read English or were blind, because those investors were not "negligent in relying on [the bank's] representatives instead of reading the agreements themselves." *Id*. at 428. Neither the BR Parties nor their counsel contend that they are unable to read English, are blind, or are similarly limited in their competency to evaluate a contract. Rather, their allegations are more analogous to those of the investors in *Rosenthal*, who stated that they failed to read the agreement simply because the bank's representatives told them it was unimportant to do so.

The court in *Rosenthal* held that those investors had *not* sufficiently alleged fraud in the execution because they had not alleged "fraud so fundamental that they were deceived as to the basic character of the documents they signed and had no reasonable opportunity to learn the truth." *Id*. at 425. If the BR Parties' contentions are true, which the Court assumes for purposes of the pending motion, they may well establish fraudulent *inducement* that would allow the BR

Parties to avoid their obligations under the contract. But that is a matter for an arbitrator to decide, not for this Court.

### 2. Character or Essential Terms

A review of Ninth Circuit caselaw also confirms that, even if the Court were to find that Black Rock's alleged actions deprived the BR Parties of a "reasonable opportunity" to discover the change, the BR Parties' allegations would amount at most to fraud in the inducement, not fraud in the execution. In *Operating Engineers Pension Trust v. Gilliam*, the Ninth Circuit found fraud in the execution where an employer claimed that he had signed a document which the union had told him was an application to become a union member as an owner-operator. 737 F.2d 1501 (9th Cir. 1984) (applying California law). In actuality, the document was a collective bargaining agreement covering all of his employees. The court held that the employer "was not obligated to make such payments as he had reasonably relied on the union's representation that he was signing a document *of a wholly different nature*." 791 F.2d at 774 (citing *Gilliam*, 737 F.2d at 1504-05) (emphasis added).

The Ninth Circuit explained that "a party who signs a written agreement generally is bound by its terms, even though he neither reads it nor considers the legal consequences of signing it. This proposition, however, is qualified by the principle that he who signs a document reasonably believing it is *something quite different than it is* cannot be bound to the terms of the document." 737 F.2d at 1504. (emphasis added). The Ninth Circuit gave the example of a person who signs a promissory note reasonably believing he only gave his autograph as the type of contract that would be void *ab initio*. In contrast, *S. California Retail Clerks Union v. Bjorklund* provides an example of fraudulent inducement. 728 F.2d 1262 (9th Cir. 1984); *see Rozay's Transfer*, 791 F.2d at 773-74 (holding out *Bjorklund* as a case involving fraudulent inducement and not fraud in the execution). Bjorklund alleged that a union officer secured Bjorklund's

PAGE 13 – OPINION AND ORDER

signature on a collective bargaining agreement ("CBA") by falsely telling him that he would be eligible for a pension under the agreement. *Id*. at 1263. Under the terms of the CBA, however, Bjorklund was not eligible for a pension because he was an employer. *Id*., n. 1.

The facts here more closely resemble *Bjorklund* than *Gilliam*. Bjorklund alleged that the union officer falsely stated that Bjorklund would be eligible for a pension under the CBA, and Bjorklund did not verify that statement before signing. Similarly, the BR Parties allege that Black Rock falsely implied that the GTA and FAs ensured that the BR Parties would receive the full value of their investment if Black Rock exercised its option to buy the franchises, even though the text of the contract ensured no such thing. The employer in *Gilliam* did not know he was signing a contract but believed he was merely applying to become a union member. These cases suggest that fraud in the execution occurs when the deception is so fundamental, like asking someone to "autograph" a promissory note, that it deprives a party of knowing the nature of the document. *Rozay's Transfer* says as much: "[fraud in the execution] induces a party to believe the nature of his act is something entirely different than it actually is." 791 F.2d at 774.

The BR Parties contend that a focus on the character of the document is misplaced, emphasizing that the Ninth Circuit went on to say that fraud in the execution arises "when a party executes an agreement 'with neither knowledge nor reasonable opportunity to obtain knowledge of its character *or its essential terms*.'" *Id*. (emphasis added). The purchase option terms, the BR Parties argue, constitute essential terms. But the BR Parties cite no authority supporting their argument that the purchase option terms of Section 15.7 were so "essential" as to qualify Black Rock's alleged deception as fraud in the execution rather than fraudulent inducement. To the contrary, caselaw suggests that a term is essential when it bears on the fundamental nature of the contract. *See Gilliam*, 737 F.2d 1501; *Rosenthal*, 14 Cal. 4th 394.

The fraudulent conduct that the BR Parties allege, assuming that it occurred, did not so fundamentally alter the *nature* of the agreement that the BR Parties did not even understand that they were entering into a contractual arrangement. Rather, the BR Parties simply assert that, in the absence of the fraudulent representation made by Black Rock's counsel, the BR Parties would not have signed their respective contracts or entered into these agreements. The BR Parties can only avoid submitting their dispute and allegations of fraud to an arbitrator if they can show that the contract was void due to fraud in the execution, but the facts presented at best support only a defense of fraudulent inducement. Thus, whether there was fraudulent inducement that can provide substantive relief to the BR Parties is an issue to be decided by an arbitrator.

## CONCLUSION

The Court will not abstain from exercising jurisdiction here, as the first-to-file rule does not apply to federal-state proceedings and the narrow justification for abstention under *Colorado River* is not met. On the merits of the pending petition, there is no question of material fact as to the existence and validity of an arbitration clause between the parties. Even accepting as true the facts stated by Respondents, they have not adequately alleged fraud in the execution but only fraudulent inducement. Thus, the contract may be voidable, depending on the decision of an arbitrator; it is not void, and the arbitration clause therefore requires that the dispute be resolved by an arbitrator. The Court GRANTS the Petition to Compel Arbitration (ECF 1) and ORDERS the parties to arbitrate this dispute consistent with the terms of their respective agreements.

**IT IS SO ORDERED**.

DATED this 14th day of August, 2020.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge